# In the United States Court of Federal Claims

No. 14-687C

(Filed: July 7, 2016)

*************************************** *
  *
AVIATION & GENERAL INSURANCE   *
COMPANY, LTD., *et. al.*,   *    Fifth Amendment Taking Claim;
  *    President's Termination of Lawsuits
                  Plaintiffs,   *    Against Libya; Foreign Claims
  *    Settlement Commission; <u>Penn Central</u>
v.   *    Factors; Analysis of Investment
  *    Backed Expectations and Economic
THE UNITED STATES,   *    Impact; Summary Judgment Based
  *    Upon Stipulated Facts.
                  Defendant.   *
  *
*************************************** *

*Steven R. Perles, Edward B. MacAllister*, and *Joshua K. Perles*, Perles Law Firm, PC, Washington, D.C., for Plaintiffs.

*L. Misha Preheim,* with whom were *Joyce R. Branda,* Acting Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, and *Reginald T. Blades, Jr.,* Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

OPINION AND ORDER ON
<u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

WHEELER, Judge.

      This case presents novel Fifth Amendment taking claims arising from the Government of Libya's terrorist attacks in bombing Pan Am Flight 103 over Lockerbie, Scotland in 1988, and in hijacking EgyptAir Flight 648 in 1985. Plaintiffs assert that they had valid causes of action against Libya pending in the U.S. District Court for the District of Columbia, but that President George W. Bush extinguished those actions by restoring sovereign immunity to Libya in 2008. In so doing, President Bush issued an Executive Order terminating the lawsuits against Libya and referring the disputes to the Foreign Claims Settlement Commission. However, the Settlement Commission ruled that it lacked

jurisdiction over Plaintiffs' claims, leaving Plaintiffs with no avenue for recovery. Plaintiffs' taking claims followed in this Court. For the reasons explained below, the Court denies Plaintiffs' claims.

Factual Background

In its May 26, 2016 opinion and order denying the Government's motion to dismiss, the Court provided a detailed description of the factual bases for Plaintiffs' claims. See Aviation & Gen. Ins. Co. Ltd. v. United States, 121 Fed. Cl. 357 (2015). As relevant to the parties' cross-motions for summary judgment, the Court includes a brief recitation of the facts. On November 23, 1985 and December 21, 1988, Libyan-sponsored terrorists hijacked EgyptAir Flight 648 and bombed Pan Am Flight 103, respectively. Plaintiffs are insurance companies and an asset management company that insured in part both aircrafts. Joint Statement of Material Facts ("JSMF") ¶¶ 1, 2. All but one Plaintiff is a foreign corporation. JSMF ¶ 2. As a result of the attacks, Plaintiffs paid approximately $64 million to their insureds for both aircrafts. JSMF ¶¶ 5, 7, 9.

At the time of the terrorist attacks, as now, Plaintiffs could not bring claims against Libya. The Foreign Sovereign Immunities Act of 1976 prohibits suits against other countries in U.S. courts, with certain exceptions. See 28 U.S.C. § 1604 (immunity for foreign states); §§ 1605-1607 (providing exceptions). One exception, now repealed, stripped a foreign state of immunity in any suit arising from certain acts of terrorism that occurred when the state was designated a sponsor of terrorism. See 28 U.S.C. § 1605(a)(7). On January 28, 2008, Congress amended the Act and designated Libya a sponsor of terrorism. JSMF ¶¶ 17-18; 28 U.S.C. §1605(A). Then, Plaintiffs filed two separate lawsuits seeking indemnification for their payments to victims of the attacks on Pan Am Flight 103 and EgyptAir Flight 648. JSMF ¶¶ 14-15.

In August 2008, while Plaintiffs' lawsuits were pending in U.S. District Court, Congress passed the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008), restoring Libya's sovereign immunity and implementing a Claims Settlement Agreement between the United States and Libya. JSMF ¶¶ 20-21, 28; Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya, 2008 U.S.T. Lexis 72, entered into force Aug. 14, 2008. In exchange, Libya paid the U.S. Government $1.5 billion to ensure payment to specified terrorism victims with claims against Libya. JSMF at A185.

On October 31, 2008, President George W. Bush issued Executive Order No. 13,477 providing that any pending suit in any U.S. court by United States or foreign nationals related to Libyan-sponsored terrorism shall be terminated. JSMF ¶¶ 23, 25-27. The U.S.

2

District Court dismissed Plaintiffs' lawsuits for lack of subject matter jurisdiction.  JSMF ¶ 27.  Pursuant to Executive Order No. 13,477 and to compensate victims, the State Department referred U.S. nationals' claims against Libya to the Foreign Claims Settlement Commission that was funded by the $1.5 billion payment from Libya.  JSMF ¶ 34. Importantly, Executive Order No. 13,477 does not direct the State Department to refer claims by foreign companies to the Foreign Claims Settlement Commission.  Nevertheless, in 2010, certain Plaintiffs brought claims before the Settlement Commission.  They claimed to "stand in the shoes" of victimized U.S. nationals and to be entitled to compensation through the Foreign Claims Settlement Commission.  JSMF ¶¶ 37, 42.  Disagreeing, the Settlement Commission dismissed Plaintiffs' claims for lack of jurisdiction.  JSMF ¶¶ 39, 43.  The Settlement Commission's dismissal is the impetus for Plaintiffs' claims before this Court.

On July 31, 2014, Plaintiffs filed suit in this Court alleging takings of their legal claims against Libya without just compensation in violation of the Fifth Amendment.  On December 7, 2015, the Government filed a motion for summary judgment, and Plaintiffs filed a cross-motion for summary judgment on January 15, 2016.  On June 16, 2016, the Court heard oral argument.  The matter is fully briefed, and both motions are ready for decision.  For the reasons set forth below, the Court grants the Government's motion for summary judgment.

## Discussion

Summary judgment is appropriate when the evidence indicates that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c); Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247-48 (1986).  A "genuine" dispute is one that "may reasonably be resolved in favor of either party," and a fact is "material" if it might significantly alter the outcome of the case under the governing law.  Anderson, 477 U.S. at 248, 250.  In determining the propriety of summary judgment, a court will not make credibility determinations, and will draw all inferences in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Here, the parties agree to all material facts, and therefore disposition of the case on summary judgment is appropriate.  See, e.g., Hr'g Tr., June 16, 2016 at 23-24, Dkt. No. 58.

To state a claim for a taking under the Fifth Amendment's just compensation clause, the plaintiff must establish that it was the owner of property and that the United States took the property for a public purpose.  Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009); Shanghai Power Co. v. United States, 4 Cl. Ct. 237, 239-40 (1983).  In its opinion denying the Government's motion to dismiss, the Court recognized,

as a matter of law, Plaintiffs' property interest in the insurance contracts they sought to protect with a legal claim against Libya.  Aviation & Gen. Ins. Co., 121 Fed. Cl. at 362-66.  The Government invites the Court to reconsider its holding.  However, the Government fails to present new precedent or a new factual basis that would call into question the Court's prior decision.  The Court declines the Government's invitation.  For the reasons explained in the Court's May 26, 2015 opinion, Plaintiffs have a cognizable property interest.

Next, the Court must determine if there was a taking for which the Plaintiffs are entitled to compensation.  The "Fifth Amendment's guarantee . . . [is] designed to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. United States, 364 U.S. 40, 49 (1960).  However, the Courts have been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government.  Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978).  Whether there has been a taking depends largely upon the particular circumstances in each case.  Id. (quoting another source).  In other words, the Court must weigh all relevant factors to determine whether Plaintiffs' loss is one that in all fairness and justice ought to be shifted to the public rather than be shouldered by Plaintiffs alone.  Belk et al. v. United States, 858 F.2d 706, 709 (Fed. Cir. 1988) (quoting another source).

"Since the reemergence of Fifth Amendment takings law from its long Twentieth-century slumber, takings claims have come in a variety of forms arising from a variety of fact patterns, some of which fit less than comfortably in to the regulatory or physical takings dichotomy."  Abrahim-Youri et al. v. United States, 139 F.3d 1462, 1466 (Fed. Cir. 1997) (citing another source).  The Court agrees with the parties that while the facts of this case do not neatly fit those of a traditional regulatory taking, the principal factors in a regulatory takings analysis apply: the character of the governmental action; the extent to which the regulation has interfered with distinct investment-backed expectations; and the economic impact of the regulation on the plaintiff.  Penn Central, 438 U.S. at 124; see Abrahim-Youri, 139 F.3d at 1466-68 (treating a takings claim based on espousal as a regulatory taking).

Plaintiffs cannot claim an investment-backed expectation free of government involvement nor can they characterize the Government's action as novel or unexpected.  Where plaintiffs could have reasonably expected their property interests to be adversely affected by Government action, the commitment of private resources to the creation of property interests is deemed to have been undertaken with that risk in mind.  In such circumstances, the call for just compensation on grounds of fairness and justice is considerably diminished.  See, e.g., Abrahim-Youri et al. v. United States, 36 Fed. Cl. 482,

4

486 (1996) (collecting cases) aff'd, Abrahim-Youri, 139 F.3d 1462 (Fed. Cir. 1997).  This is the case here.

"[T]hose who engage in international commerce must be aware that international relationships sometimes become strained, and that governments engage in a variety of activities designed to maintain a degree of international amity."  Abrahim-Youri, 139 F.3d at 1468.  Businesses, such as Plaintiffs, that engage in international commerce are fully aware that the security of their enterprise is uniquely dependent on the maintenance of stability and good order in the relationships among nations.  See, e.g., id.  Where, as here, the relations between countries become strained, the possibility that the President will intervene is properly recognized as both a shared benefit and a shared risk of those who trade abroad.  Shanghai Power, 4 Cl. Ct. at 245.  Our Presidents have exercised the power to settle international claims filed in U.S. courts since at least 1799.  See Dames & Moore v. Regan, 453 U.S. 654, 679 (1981).  Thus, the President's involvement in settling claims against Libya and setting up the Settlement Commission cannot constitute a novel interference with any investment-backed expectation.

Instead, Plaintiffs assert they had an investment-backed expectation to bring suit against and recover from Libya after Congress briefly lifted Libya's sovereign immunity.  However, by providing that the State Sponsor of Terrorism exception no longer applies, the United States merely restored the default rule of sovereign immunity.  Foreign sovereign immunity "reflects current political realities and relationships" and its availability, or lack thereof, "generally is not something on which parties can rely in shaping their primary conduct."  Republic of Iraq v. Beaty, 556 U.S. 848, 864-65 (2009) (quoting Republic of Austria v. Altmann, 541 U.S. 677, 696 (2004)) (internal quotation marks omitted).  In affairs between nations, outstanding claims filed in one nation against the government of another country are "sources of friction" between the two sovereigns.  United States v. Pink, 315 U.S. 203, 225 (1942).  While individuals may have legitimate claims against foreign nations, the presence of these claims and attempts to collect may seriously harm the relations between the two countries.  Shanghai Power, 4 Cl. Ct. at 244.  The President's power to eliminate sources of friction between sovereigns is a long-standing and integral aspect of the President's authority to conduct foreign relations.  See, e.g., id. at 245.

The last factor the Court must consider is the economic impact of the Government's actions.  Undoubtedly, the Government extinguished Plaintiffs' claims without providing an alternative forum in which Plaintiffs could bring their claims.  However, the mere fact that Executive Order No. 13,477 did not provide any alternative forum in which Plaintiffs could assert their claims, is not sufficient to establish a taking.  Belk, 858 F.2d at 709.  Plaintiffs' only remaining challenge is to the Government excluding Plaintiffs from the Settlement Commission's jurisdiction.  To be sure, the Government has no constitutional

obligation to act as a collection agent on Plaintiffs' behalf.  <u>Shanghai Power</u>, 4 Cl. Ct. at 244; <u>accord</u> <u>Pink</u>, 315 U.S. at 228.  Further, the parties do not request and indeed agree this Court lacks jurisdiction to review the Settlement Commission's decision that it lacked subject matter jurisdiction over Plaintiffs' claims.  <u>See</u> 22 U.S.C. § 1623(h) (describing the finality of Commission decisions).

Finally, the Court is concerned that the value of Plaintiffs' loss of its causes of action does not have a definite value and thus is speculative.  While the Court assumes, without deciding, that Plaintiffs plausibly could have pursued a claim against Libya to final judgment, it is skeptical that Plaintiffs would have been able to collect on the judgment. <u>See, e.g.</u>, <u>Sperry v. United States</u>, 493 U.S. 52, 53 (1989) ("Had the President not agreed to the establishment of the [Iran-U.S. Claims] Tribunal and the Security Account, [Plaintiff] would have had no assurance that it could have pursued its action against Iran to judgment or that a judgment would have been readily collectable."); <u>accord</u> <u>In re Islamic Republic of Iran Terrorism Litig.</u>, 659 F. Supp. 2d 31, 49 (D.D.C. 2009) ("A number of practical, legal and political obstacles have made it all but impossible for plaintiffs in these [Foreign Sovereign Immunities Act] terrorism cases to enforce their default judgments. . . .").  Given these considerations, the Plaintiffs' economic injury is not one that fairness and justice require be shifted to the public at large.

Conclusion

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment, and DENIES the Plaintiffs' motion for summary judgment.  The Court directs the Clerk of Court to enter judgment for the Defendant.  No costs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge